UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ENZO LIFE SCIENCES, INC., | ) |
| Plaintiff, | ) 04-CV-01555 (RJS) |
| vs. | ) |
| AFFYMETRIX, INC., | ) |
| Defendant. | ) |

**DEFENDANT AFFYMETRIX, INC.'S REPLY MEMORANDUM
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................................. 1

II. ARGUMENT ........................................................................................................................ 2

      A.      Affymetrix Is Entitled To Judgment On Enzo's Pleaded Unauthorized Use Claims ................................................................................................................. 2

      B.      Affymetrix Is Entitled To Judgment On Enzo's Section 5 "Ownership" Claim ................................................................................................................... 2

      C.      Affymetrix Is Entitled To Judgment On Enzo's "Shortfall" Claim ........................ 5

      D.      Affymetrix Is Entitled To Judgment On Enzo's "Reasonable Efforts" Claim ................................................................................................................... 7

      E.      Affymetrix Is Entitled To Judgment On Enzo's New "Unauthorized Use" Theory ................................................................................................................. 8

      F.      Affymetrix Is Entitled To Judgment On Enzo's Unpled "Implied Covenant" Theory ............................................................................................... 9

III. CONCLUSION .................................................................................................................. 10

# TABLE OF AUTHORITIES

**Cases**

*Cole v. Maclowe*,
  99 A.D.3d 595 N.Y.S.2d 21 (N.Y.A.D. 1 Dept. 2012) ..................................................... 6

*Globe Refining Co. v. Landa Cotton Oil Co.*,
  190 U.S. 540 (1903) ........................................................................................................ 1

*Moscato v. TIE Techs., Inc.*,
  No. 04 Civ. 2487 (GBD), 2005 WL 146806 (S.D.N.Y Jan. 21, 2005) ........................... 10

I.   INTRODUCTION

Enzo's only claims against Affymetrix are for alleged breach of the Enzo-Affymetrix distributorship agreement that the parties entered in 1998 and Enzo terminated in November 2003 (the "Agreement" or "Agmt."). Enzo does not contend that the Agreement is in any way ambiguous. Thus, it is appropriate for this Court to interpret the contract as a matter of law as necessary to decide Affymetrix's motion for summary judgment. Enzo's opposition also confirms that there are no genuine issues of material fact, and that Affymetrix is entitled to judgment as a matter of law under the plain and unambiguous terms of the Agreement.

Enzo spends much of its opposition ascribing a "motive" to Affymetrix for the alleged breaches of the Agreement. Enzo's assertions as to motive do ***not*** create any issues of material fact. It is well-settled that "motive for the breach commonly is immaterial in an action over the contract." *Globe Refining Co. v. Landa Cotton Oil Co.*, 190 U.S. 540, 547 (1903). The only relevant facts are what happened. Those facts are undisputed. Boiled down, Enzo's opposition states the following underlying facts: As a non-exclusive distributor, Affymetrix purchased certain labeling reagents ("PRODUCTS") from Enzo and distributed them in connection with sales of Affymetrix's GeneChip® arrays. Opp. at 3; Agmt. § 1. After the initial three-year term, either party could terminate the Agreement without cause, upon notice. *Id.* at 10; Agmt. § 16. The notice period was reduced through a series of amendments to, ultimately, two-weeks.[1] On October 28, 2003, the day it signed the final amendment, Enzo gave notice to terminate the Agreement (effective two weeks later, November 12, 2003), and sued Affymetrix. Opp. at 9; Root Decl., Ex. 1.[2] During the 5-year term of the Agreement, Affymetrix developed its own proprietary labeling reagents, RLR and DLR, as non-infringing

---

[1] These amendments are included with the Agreement attached as an exhibit to the Norviel Decl., which is Exhibit 4 to the Root Decl. submitted December 21, 2012.

[2] A couple of times in its opposition, Enzo mistakenly refers to July 2003 as being "more than a year before Enzo terminated the Agreement." Opp. at 9, 12.

alternatives to Enzo's PRODUCTS.  Opp. at 6, 10-11.  During the term of the Agreement, Affymetrix compared the performance of RLR and DLR against the performance of the PRODUCTS.  *Id*. at 11, 13.  In 2002, Affymetrix purchased more PRODUCTS than it needed for that year, such that by February of 2003, Affymetrix had an inventory of PRODUCTS sufficient to fulfill its customer orders for more than 15 months, *i.e.*, through May 2004.  *Id*. at 8.  Enzo terminated the Agreement effective November 12, 2003.  *Id*. at 9.

There are no disputes of material fact and this Court should grant Affymetrix's motion for summary judgment.

## II.     ARGUMENT

**A.     Affymetrix Is Entitled To Judgment On Enzo's Pleaded Unauthorized Use Claims**

Enzo does not challenge, and therefore concedes, Affymetrix's showing that Enzo PRODUCTS were *not* used for the Roche AmpliChip CYP450 and that in this and all other respects, Affymetrix complied with the "research use only" restrictions of the Agreement.  *See* Opening Brief ("OB") at 15-16.  Thus, summary judgment is appropriate on these claims.

**B.     Affymetrix Is Entitled To Judgment On Enzo's Section 5 "Ownership" Claim**

Enzo claims that Section 5 gives it "ownership" of Affymetrix's proprietary labeling reagents, RLR and DLR.  This claim is baseless, just like Enzo's now-abandoned claim to "all" of Affymetrix's products and patents.  *See* OB at 10-15, 19; Opp. at16, n. 3.  Enzo now agrees that Section 5 is simply a grant-back clause.  *Id*. at 14.  Enzo also agrees that Section 5 specifies the prerequisites that must be met before Affymetrix would be obliged to grant back any rights to Enzo as to inventions or products conceived by Affymetrix.  *Id*. at 5, 14.  One prerequisite is that Affymetrix must have "conceived" of the invention or product "during the course of its use of Enzo's Products."  *Id*. at 5.  Enzo concedes that "during the course of AFFYMETRIX' use" refers to Affymetrix's use of the PRODUCTS and not, as Enzo previously argued, the duration of the Agreement.  *Id*. at 15; *see* OB at 13.  Another prerequisite is that the invention or product must be "directed to" the Enzo PRODUCTS.  *Id*. at 5, 15.  Enzo must show both prerequisites are satisfied.  Enzo cannot show that either one, let alone both, is satisfied.

Enzo does not adduce any evidence that Affymetrix used Enzo's PRODUCTS to "conceive" of RLR or DLR, and makes no argument that it did.[3]  Enzo's sole argument is that "Affymetrix used Enzo Products to **develop**" RLR and DLR.  *Id*. at 11.  The evidence to which Enzo points shows nothing more than that Affymetrix compared the performance of RLR and DLR to the performance of Enzo PRODUCTS.  Opp. at 11, 13.  Enzo argues that such "side-by-side comparisons of the results" of RLR/DLR versus Enzo reagent PRODUCTS shows that Affymetrix used the PRODUCTS to "develop" RLR/DLR.  *Id*. at 13.

"Comparing results" is not "developing," let alone "conceiving" as Section 5 requires.  A new labeling reagent must be "developed" **before** its performance (or the results it produces) can be compared to the performance or results of another product.  Thus, Affymetrix did not "use" Enzo PRODUCTS to "develop" RLR or DLR, as Enzo asserts, because RLR and DLR necessarily were already developed before the comparison was made.

"Conceiving" an invention or product is yet another step removed from "comparing."  An invention or product must be "conceived" before it can be developed.  The act of "conceiving" an invention or product is far removed from any subsequent act of comparing its performance or results against another product.  Because the grant-back clause applies only to inventions and products that are "conceived" during use of the PRODUCTS, Enzo's claim fails from the get-go.

Enzo's claim fails for the separate and additional reason that Affymetrix's innovative and proprietary RLR and DLR were not "directed to" the PRODUCTS or their use or improvements thereon.  As expressly defined, "PRODUCTS" means reagents or reagent kits that are **both** listed in the Agreement's Exhibit B **and** covered by one or more claims of Enzo's PATENTS listed in the Agreement's Exhibit A.  Agmt. at 2.  For Enzo to obtain any grant-back

---

[3] Enzo itself points out that Affymetrix has a" long history" of working on different labeling reagents.  Opp. at 6 (citing Grassotti Decl, Ex. 4 (Fodor Depo.) at 30:20-31:16).  Affymetrix's long history of experimenting with "different labeling compounds" dates back to 1989, which is nine years before the Agreement was entered into.  Grassotti Decl, Ex. 4 at 31:12-16.

rights under Section 5, the innovation had to be "directed to" improving (or inventing a new use for) an Enzo PRODUCT and be covered by (*i.e.*, infringe) a claim of an Enzo PATENT.

Far from being "directed to" the PRODUCTS, Affymetrix's innovative and proprietary RLR and DLR were *directed away* from the PRODUCTS and their use. Indeed, the facts Enzo adduces show that Affymetrix's work on RLR and DLR was "*aimed at* developing its own labeled nucleotide kits to *replace* Enzo's Products" and that Affymetrix designed RLR and DLR "'so as *not to infringe* Enzo's patents' so that Affymetrix would have a *substitute* for Enzo's Products." Opp. at 6 (citation omitted).[4] Enzo concedes that Affymetrix's proprietary labeling reagents, RLR and DLR, do not infringe Enzo's PATENTS. *Id*. at 6, 10. RLR and DLR were thus directed away from the PRODUCTS in all respects.

Enzo makes only a token effort to muster an argument, offering the meaningless naked assertion that "[t]he replacement products almost by definition were inventions or products directed to the Products and their use, if not necessarily improvements thereon." Opp. at 15. If anything, Enzo's assertion that RLR and DLR were not "improvements" renders the grant-back clause inapplicable, as Enzo agrees that the essence of Section 5 is "improvements directed to the Products." *Id*. at 5. Enzo's inability to articulate any basis to even suggest, much less demonstrate, that RLR and DLR were "directed to" the PRODUCTS serves only to confirm the conclusion that Enzo's claim is baseless.

Because Enzo cannot show that the "conceived" and "directed to" prerequisites for triggering grant back rights were satisfied, Affymetrix is entitled to summary judgment for two separate and independent reasons. Moreover, Enzo would not have "ownership" of RLR and DLR even if both prerequisites had been satisfied. The grant-back is limited in scope. At most, Enzo would be entitled to rights to use Affymetrix's invention or product in fields outside of Affymetrix's line of business. *See* OB at 13; Opp. at 5.

---

[4] Unless otherwise noted, all emphases are added.

C.       **Affymetrix Is Entitled To Judgment On Enzo's "Shortfall" Claim**

Enzo has almost entirely abandoned its "shortfall" claim because the undisputed facts show that Affymetrix purchased more PRODUCTS than required. Enzo does not claim that Affymetrix owes it any "shortfall" payment for any of the four full years of the Agreement, 1999 through 2002. Enzo's sole argument is that "Affymetrix was required to remit a shortfall payment to Enzo of between $6,569,332 and $7,232,932 based on its ***2003 purchases*** of Enzo Products." Opp. at 20. Enzo's claim of a "shortfall" in 2003 falls under the weight of the undisputed facts.

It is undisputed that in 2002 Affymetrix purchased far more Enzo PRODUCTS than were needed in 2002, and had a substantial inventory of Enzo PRODUCTS heading into 2003. *Id*. at 8. Enzo notes: "As of February, 2003, Affymetrix had on hand 27,397 Enzo kits; enough to fulfill its customer's orders for more than 15 months." *Id*.; *see also id*. at 22 (Affymetrix had "well over a full year of inventory of Enzo kits on hand" in March 2003). Thus, by Enzo's own reckoning, Affymetrix had no need to purchase ***any*** quantity of PRODUCTS in 2003 because it already had purchased PRODUCTS from Enzo in quantities sufficient to cover ***all*** of 2003. Even though it had sufficient quantity to cover all of 2003, Affymetrix purchased an additional quantity of between 3,600 and 5,000 kits from Enzo in 2003. *Id*. at 20.

There is nothing in Section 6 that required Affymetrix to match the quantities of PRODUCTS purchased to the quantities used *in the same year*. A shortfall is triggered under Section 6 only "where PRODUCTS were purchased from Enzo in quantities less than would be used in conjunction with the GeneChip® arrays or array sets associated with a PRODUCT during such calendar year." Agmt. § 6. The reference to "during such calendar year" appears at the end of the sentence and describes only the period during which the GeneChip® arrays or array sets are to be used.[5] The language focuses on the relevant question whether GeneChip®

---

[5] If the parties had intended to place primary significance on the date of purchase, the provision would have read: ". . . where PRODUCTS were purchased *during such calendar year* from
(continued...)

5

arrays sold during the year can be matched with Affymetrix's purchases of PRODUCTS from Enzo, regardless of the year in which PRODUCTS were purchased.  The remaining language of Section 6 bolsters this point.  Affymetrix is entitled to "adjust" a potential penalty payment by establishing that sales of Enzo labeling reagents were made to Affymetrix customers "directly by ENZO or authorized ENZO distributors."  Agmt. § 6.  That language confirms that the overarching purpose of Section 6 is to compensate Enzo if GeneChip® arrays have been used with labeling kits other than the PRODUCTS (or Enzo reagents sold directly by Enzo or its other distributors).  There is no reference in Section 6 to the year during which the labeling kit had to be sold by Enzo or its distributors to the Affymetrix customers.

That purchases made in one year can be carried over to the next year is further bolstered by the fact that there was no mechanism in the Agreement for Enzo to buy back PRODUCTS from Affymetrix if it had excess inventory at the end of a calendar year.  The only reasonable interpretation of the Agreement is that Affymetrix was entitled to carry over its purchases from one year to the next.  Were it otherwise, Affymetrix would have to discard purchased inventory at the end of each year and repurchase that lost inventory the next year, penalizing Affymetrix for purchasing "too much" (when Section 6 penalizes it for purchasing "too little") and giving Enzo an unwarranted windfall.  This "runs afoul of the well settled principle that a contract should not be interpreted to produce an absurd result, one that is commercially unreasonable, or one that is contrary to the intent of the parties."  *Cole v. Maclowe*, 99 A.D.3d 595, 596, 953 N.Y.S.2d 21 (N.Y.A.D. 1 Dept. 2012).

A final but no less significant point is that Enzo terminated the Agreement before the end of calendar year 2003.  Enzo cannot claim that Affymetrix breached an obligation to purchase a sufficient annual quantity of PRODUCT in an incomplete year, especially when Section 6 calls for reconciliation to be made "[a]t the end of the each calendar year."  *Id*.

---

Enzo in quantities less than would be used in conjunction with the GeneChip® arrays or array sets associated with a PRODUCT during *that* calendar year."

### D.     Affymetrix Is Entitled To Judgment On Enzo's "Reasonable Efforts" Claim

In its opposition, Enzo argues that Affymetrix breached its obligations to use "commercially reasonable efforts" to advocate Enzo reagent PRODUCTS for use with the Roche AmpliChip CYP450 array.  As Enzo concedes, however, the Roche AmpliChip CYP450 is a *diagnostic* device, and, by the terms of the Agreement, Enzo's reagent PRODUCTS were limited to "research use only" and Affymetrix was prohibited from distributing PRODUCTS for "diagnostic purposes."  Opp. at 19; Agmt. § 1(e).  Affymetrix abided by this restriction.

Affymetrix was entitled to distribute Enzo PRODUCTS only "in association with applicable GeneChip® assays" using agreed-upon package inserts.  Agmt.§ 13; *see also id*. § 10.  In the agreed-upon package inserts, Affymetrix was to "recommend and instruct the end-user of that assay to use only the PRODUCTS contained therein" and to advise end-users that any warranty would be ineffective "as a result of failure to use the PRODUCTS associated with such assays contained therein."  *Id*. § 13.  Affymetrix also was to promote the use of Enzo PRODUCTS with applicable GeneChip® arrays through "individual client contact, direct mailings, catalog listings and trade meeting promotions."  *Id*. § 10.

It is undisputed that throughout the 5-year term of the Agreement, Affymetrix used the agreed-upon package inserts "in association with applicable GeneChip® assays" as called for under the Agreement.  Until Enzo terminated the Agreement, Affymetrix otherwise promoted the use of Enzo's PRODUCTS, including listing the Enzo PRODUCTS in its product catalogs as required for use with the associated GeneChip® arrays.  Enzo does not contend otherwise.

Enzo's sole contention is that Affymetrix breached its obligation to use commercially reasonable efforts "by developing replacement products during the course of the parties' agreement."  Opp. at 17.  That Affymetrix developed RLR and DLR during the term of the Agreement was in no way prohibited by the Agreement or a breach of Affymetrix's obligation to use commercially reasonable efforts to distribute Enzo's PRODUCTS.  It is undisputed that either party could have terminated the Agreement "without cause at any time" (Opp. at 10), and

having RLR and DLR on hand as replacement products was simply prudent, as borne out by Enzo's abrupt termination of the Agreement in 2003.

Enzo argues that development of RLR and DLR took Affymetrix's focus away from trying to increase its share of the market for Enzo's reagent PRODUCTS. Opp. at 17-18. This argument is absurd. It was in Affymetrix's interest to sell as many GeneChip® arrays as possible, and it could only distribute Enzo PRODUCTS in association with array sales. Enzo does not contend, and it would be ludicrous if it did, that Affymetrix reduced its sale of arrays to avoid selling Enzo PRODUCTS. It also was in Affymetrix's financial interest to sell the Enzo reagent PRODUCTS with the associated arrays, as contemplated by the Agreement, because that would be added revenue to Affymetrix. The undisputed reason that Affymetrix "had only achieved between 60 and 70% market penetration in connection with its distribution of Enzo's Products," even though "more than 90% of GeneChip customers overall relied on Enzo products to label RNA samples" (*id*. at 17), is that ***Enzo and its other distributors were selling directly to Affymetrix's customers***. Root Decl., Ex. D (Cowell Decl.) ¶ 5. Indeed, the Agreement expressly recognized that "PRODUCTS may be purchased directly from Enzo or its distributors or licensees" and that Affymetrix's sales of PRODUCTS would thus be negatively affected. Agmt. § 10.

E.     **Affymetrix Is Entitled To Judgment On Enzo's New "Unauthorized Use" Theory**

Enzo's new theory is that "Affymetrix's use of Enzo's Products during the effective period of the contract to develop RLR and DLR exceeded the permitted uses specified in Section 5" of the Agreement. Opp. at 12. As discussed above, Affymetrix did not use Enzo PRODUCTS to develop RLR and DLR, as any comparing of the performance of RLR or DLR against an Enzo PRODUCT necessarily had to occur after RLR/DLR were already developed.

Even if, *arguendo*, "comparing" can be considered "developing," the Agreement expressly authorized Affymetrix to use PRODUCTS for "developing new gene chip products." Agmt. § 5(c). Enzo does not dispute that the Agreement so provides. Rather, Enzo argues only that RLR and DLR are not "gene chip products" within the meaning of the Agreement (Opp. at

13) and they are not "new." *Id*. at 14. Enzo's argument that "gene chip products" is limited to the "arrays" is contrary to the Agreement's plain language. The Agreement refers to gene chip "arrays" (and "assays") by themselves when the intent was to limit it to arrays (or assays). *See*, *e.g*., Agmt. § 1(c) ("GeneChip® arrays" and "GeneChip® assays"); *id*. § 6 ("GeneChip® arrays or array sets"); *id*. § 13 ("GeneChip® assays").

The Agreement used the unlimited term "gene chip products" to refer more broadly to Affymetrix's entire line of products. For instance, Section 5 permits the use of PRODUCTS for *optimizing* "GeneChip® products" in subsection (b) and for *developing* "new gene chip products" in subsection (c). These back-to-back subsections reflect the parties intent to use "products" broadly: "GeneChip® products" with the registration mark refers to Affymetrix's existing, branded products, and "new gene chip products" refers to new products that Affymetrix might develop. Enzo's opposition shows that RLR and DLR were developed into branded Affymetrix products. Opp. at 9 (RLR became part of the "GeneChip® IVT Labeling Kit"); *see also id*. at 6-8 ("GeneChip labeling kits"). Put simply, RLR and DLR were designed specifically as "gene chip products" and were developed into GeneChip® products.

Enzo's fall-back argument is that RLR and DLR were not "new" because they were a "substitute" for Enzo's PRODUCTS and their respective performances in assays "was not significantly different." Opp. at 14. This is just more grasping at straws. RLR and DLR were innovative, novel labeling compounds which, as Enzo concedes, do not infringe any of Enzo's patents. RLR and DLR did not exist until Affymetrix developed them. Whether they perform the same, better, or worse than Enzo's labeling reagents is irrelevant. RLR and DLR were new in all respects and, more to the point, new gene chip products.

**F.**     **Affymetrix Is Entitled To Judgment On Enzo's Unpled "Implied Covenant" Theory**

Enzo's last resort is the implied covenant of good faith and fair dealing. Enzo did not plead an implied covenant claim, nor could it. Enzo acknowledges that New York law does not recognize a separate implied covenant claim when a breach of contract claim based on the same facts is pled. Opp. at 24. Enzo's implied covenant theory is based on the same facts as, and

merely replicates, its breach of contract claims already refuted above, *i.e.*, its "shortfall" claim and its claim Affymetrix breached its "commercially reasonable efforts" obligation, and breached Section 5 in developing RLR and DLR.

Under New York law, an implied covenant claim that "merely replicates" breach of contract claims cannot stand, "nor can it create new contractual rights or impose additional duties." *Moscato v. TIE Techs., Inc.*, No. 04 Civ. 2487 (GBD), 2005 WL 146806, at *4 (S.D.N.Y Jan. 21, 2005). Enzo's theory is that Affymetrix breached an implied covenant by "building up a stockpile of inventory of the Products" in 2002. Opp. at 21. Enzo's theory seeks to impose on Affymetrix an additional duty – a duty to refrain from buying more PRODUCT than required for near term needs and refrain from building up inventory. The Agreement imposes no such duty. On the contrary, the Section 6 penalty for a "shortfall" provides reason and incentive to build up inventory. The Agreement contemplates that Affymetrix may build up a significant inventory, as the section headed "Storage and Stock Rotation" contains Affymetrix's express commitment "to take reasonable care not to ship PRODUCTS to its customers which have expired." Agmt. § 12.

As the Agreement expressly states, the sole relationship between Enzo and Affymetrix "shall be that of *seller and buyer*." Agmt. § 2. The Agreement is explicit that "[n]othing herein creates or constitutes a partnership, joint venture, or an agreement of agency between the parties *with respect to any activities whatsoever*." *Id*. An implied covenant is breached, as Enzo puts it, "where a contracting party's conduct deprives the other of its benefits under the contract." Opp. at 21. Enzo received the full measure of its benefits as the seller. The fact that Affymetrix purchased *more* PRODUCTS in 2002 than it needed for that year did not deprive Enzo of any benefit under the Agreement and, if anything, Enzo got a greater benefit from its increased sales.

### III.   CONCLUSION

For the foregoing reasons, and those stated in its opening brief, Affymetrix respectfully requests this Court to grant its motion for summary judgment.

Dated:  May 15, 2013	Respectfully submitted,

By:	*/s/ Peter E. Root*

Peter E. Root
Email:  peter.root@kayescholer.com
Michael J. Malecek
Email:  michael.malecek@kayescholer.com
KAYE SCHOLER LLP
Two Palo Alto Square
3000 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone:  (650) 319-4500

*Attorneys for Defendant Affymetrix, Inc.*