UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12-6-13
```

ENZO BIOCHEM, INC., *et al.*,

                        Plaintiffs,

-v-

AFFYMETRIX, INC.,

                        Defendant.

No. 04 Civ. 1555 (RJS)
MEMORANDUM AND ORDER

RICHARD J. SULLIVAN, District Judge:

Plaintiffs Enzo Biochem, Inc. and Enzo Life Sciences, Inc. (collectively, "Enzo") bring this action against Defendant Affymetrix, Inc. ("Affymetrix") for patent infringement and breach of contract under New York law. Now before the Court is Affymetrix's motion for summary judgment with respect to Enzo's contract claims. For the reasons set forth below, the Court denies the motion in part and grants it in part.

I. BACKGROUND

A. Facts[1]

Enzo "develops, manufactures and markets health care products based on molecular biology and genetic engineering techniques, and also provides diagnostic services to the medical community." (Decl. of Lauren B. Grassotti, dated May 1, 2013, Doc. No. 100 ("Grassotti Decl."), Ex. 1 at 3.) Among its ventures, Enzo markets "nucleic acid probe products to the research market," empowering "researchers to make and detect their own non-radioactive"

---

[1] The following facts are taken from the parties' Local Civil Rule 56.1 Statements ("Affy. 56.1 Stmt." and "Enzo 56.1 Stmt.") (Doc. No. 108), and the exhibits and declarations attached thereto. In deciding this motion, the Court also considered Enzo's Complaint ("Compl."), Affymetrix's brief in support of the instant motion ("Mem."), Enzo's opposition ("Opp."), and Affymetrix's reply ("Reply").

nucleic acid probes. (*Id.* at 5.) Affymetrix also markets nucleic acid probe products for DNA and RNA labeling and detection. (Decl. of Peter E. Root, dated Dec. 21, 2012, Doc. No. 90 ("Root Decl."), Ex. E ¶ 4.)

In April 1998, Enzo and Affymetrix entered into an agreement (the "Distribution Agreement" or "Agreement") by which Affymetrix would be the "nonexclusive worldwide distributor" of certain Enzo "reagent[s], component[s,] or combination[s] thereof" used "in nucleic acid labeling and detection" (the "Products" or "Enzo's Products"). (Grassotti Decl. Ex. 7 (the Distribution Agreement ("DA")) at 1–2.) The essence of the Agreement was that "Enzo [would be] providing reagents . . . and Affymetrix [would be] providing chips" that utilized those reagents. (*Id.* Ex. 5 at 116:17–20.) However, during the course of the Agreement, Affymetrix continued a longstanding project to develop two of its own reagents – known as RLR and DLR – to replace the Products that Enzo had been supplying and Affymetrix had been distributing. (Enzo 56.1 Stmt. ¶¶ 2–6.)

On October 28, 2003, Enzo gave notice of its intent to terminate the Distribution Agreement, which became effective November 12, 2003. (*Id.* ¶ 11; Opp. at 9.) Thereafter, Affymetrix began to market its RLR and DLR products. (Enzo 56.1 Stmt. ¶ 12.)

B. Procedural History

Enzo commenced this action by filing the Complaint in the United States District Court for the Eastern District of New York on October 28, 2003. (Doc. No. 90-1.) On February 24, 2004, the case was transferred to this District, where it was originally assigned to the Honorable Jed S. Rakoff, District Judge, but was thereafter reassigned to the Honorable John E. Sprizzo, District Judge, on March 5, 2004. (Doc. No. 1.) After Judge Sprizzo passed away in December 2008, the case was reassigned to my docket on January 8, 2009. (Doc. No. 21.) From March 13,

2

2009 until August 25, 2011, this action was stayed while a related case was appealed to the Federal Circuit. (Doc. Nos. 26, 58, 60.) On September 24, 2012, following a round of renewed briefing by Affymetrix and the defendants in related patent-infringement cases brought by Enzo, the Court granted summary judgment with respect to the single infringement claim asserted by Enzo against Affymetrix. (Doc. No. 79.)

Affymetrix now seeks summary judgment on Enzo's non-patent claims. At this stage of the proceedings, Enzo asserts five breach-of-contract claims, alleging that Affymetrix (1) failed to exercise "commercially reasonable efforts" to sell Enzo Products; (2) used the Products to develop competing products; (3) ignored a "grant-back" provision that vested certain rights in Enzo; (4) flouted a "shortfall" provision that required payment to Enzo for disproportionately low sales; and (5) violated the implied covenant of good faith and fair dealing by stockpiling Products. (Opp. at 1; *see* Compl. ¶¶ 45–59, 62–82.)[2] On April 11, 2013, Affymetrix filed the instant motion for summary judgment on these claims. (Doc. No. 98.) After receiving leave to take additional discovery ahead of Affymetrix's motion, Enzo filed its opposition on May 2, 2013 (Doc. No. 101), and Affymetrix replied on May 16, 2013 (Doc. No. 107).

## II. DISCUSSION

Pursuant to Federal Rule of Civil Procedure 56(a), a court may not grant a motion for summary judgment unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party bears the burden of showing that it is entitled to summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S.

---

[2] The Complaint asserted an additional claim for breach of contract based on allegations that Affymetrix sought to provide the Products to Gene Logic, Inc., in breach of the Distribution Agreement. (Compl. ¶¶ 60–62.) However, Enzo no longer asserts this claim. (Opp. at 1; *see generally* Affy. & Enzo 56.1 Stmts. (making no mention of Gene Logic, Inc.).) The Court also notes that Enzo pleads causes of action for declaratory and injunctive relief that are not at issue here. (Compl. ¶¶ 94–99.)

3

242, 256 (1986). The Court "is not to weigh evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (internal quotation marks omitted); *accord Anderson*, 477 U.S. at 249; *see also Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) ("[I]f there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment." (internal quotation marks omitted)).

Affymetrix seeks summary judgment on Enzo's five breach-of-contract claims. Under New York law, the first step in assessing a contract claim is to determine "'whether the contract is unambiguous with respect to the question disputed by the parties.'" *Law Deben. Trust Co. v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010) (quoting *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002)). That "is a question of law for the court." *Id.* "Summary judgment is appropriate if the terms of the contract are unambiguous." *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011) (citing *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008)). "On the other hand, under New York law, contract claims are generally not subject to summary judgment if the resolution of a dispute turns on the meaning of an ambiguous term or phrase." *Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 567 (2d Cir. 2011) (citing *State v. Home Indem. Co.*, 495 N.Y.S.2d 969 (1985)) (other citation omitted). "However, where language in a contract is ambiguous, summary judgment can be granted 'if the non-moving party fails to point to any relevant extrinsic evidence supporting that party's interpretation of the language.'" *Id.* (quoting *Co. Fin. de CIC et de L'Union Euro. v. Merril Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir. 2000)).

4

A. Failure to Exercise "Commercially Reasonable Efforts"

Enzo asserts that Affymetrix breached the Distribution Agreement by failing to exercise "commercially reasonable efforts" to sell Enzo's Products, in that Affymetrix developed alternative products to compete with Enzo's. (Opp. at 1, 16–17.) Unfortunately, the Complaint – as opposed to Enzo's brief – makes no such allegation. Put simply, Enzo never pleaded a claim based on the Agreement's commercial reasonableness provision or even Section 10, generally, in which that provision is found. Enzo cannot raise new claims in this way. Judge Sprizzo expressly admonished Enzo that its "[p]leading[s] set forth [its] claim," and that it would not be permitted to plead a specific breach of contract "and then [to] argue every possible breach of contract [it could] think of . . . ." *Enzo Biochem, Inc. v. Affymetrix, Inc.*, No. 04 Civ. 1555 (JES) (S.D.N.Y. July 18, 2007), *available at Enzo Biochem, Inc. v. Amersham, plc.*, No 02 Civ. 8448 (JES), Doc. No. 199 (S.D.N.Y. July 18, 2007). To the contrary, Judge Sprizzo directed Enzo "to describe with some specificity the kind of claim [it was] asserting. . . . Otherwise, [there would be] no purpose to seek leave to amend if [it] could just amend willy nilly . . . ." *Id.* Accordingly, this unpleaded claim is not properly before the Court and may not be pursued at trial. *See also Enzo Biochem, Inc. v. Amersham plc*, No. 02 Civ. 8448 (RJS), 2013 WL 5943985, at *4 (S.D.N.Y. Oct. 22, 2013) (citing cases and noting that, "[t]o the extent that Enzo omitted claims from the pleadings, it certainly cannot raise them in its summary judgment brief filed long after discovery has concluded and more than a decade after the . . . Complaint was filed"); *Caribbean Wholesales & Serv. Corp v. U.S. JVC Corp.*, 963 F. Supp. 1342, 1359 (S.D.N.Y. 1997) ("[Plaintiff] in effect is apparently attempting to add a [different contract] claim never addressed, or even hinted at, in the complaint. Such a step is inappropriate at the summary

5

judgment stage, after the close of discovery, without the Court's leave, and in a brief in opposition to a dispositive motion.").

### B. Use Restrictions on Products

Nevertheless, Enzo *did* plead that Affymetrix's development of competing products breached other provisions of the Distribution Agreement. (*See* Compl. ¶¶ 65–68; Opp. at 10–14.) Specifically, Enzo contends that Affymetrix used Enzo's Products in its efforts to develop RLR and DLR (Opp. at 10–14), and that this product development violated: (1) Section 1, which prohibits the use of "any Products to manufacture other Products or other products, except for quality control purposes or for developing new gene chip products under specific authorization from Enzo . . ." (DA § 1(d)), and (2) Section 5, which limits Product use to, among other things, "developing new gene chip products" (DA § 5(a)–(c)).[3]

Here, the record shows that Enzo's Products included "labeling reagents" and that Affymetrix developed and sold its own labeling reagents that it had tested against the Products. (Grassotti Decl. Ex. 4 at 25:2–26:8, 49:1–20, 96:10–97:4, 108:9–18 (discussing Enzo's and Affymetrix's labeling reagents and efforts to compare their efficacy); *id.* Ex. 22 at 18 (describing comparability of RLR and the "current labeling system" from Enzo); *id.* Ex. 35 (comparing the performance of Enzo Products with other products when utilized in Affymetrix's GeneChip Assays); *id.* Ex. 39 (touting "comparable data" yields from Affymetrix labeling kits as from Enzo kits); *id.* Ex. 43 (comparing the performance of Enzo Products with Affymetrix products).)

Affymetrix seeks to justify these comparison tests by insisting that they did not constitute "use" of Enzo's Products or, even if Affymetrix *did* use Enzo's Products, such use was permissible because Affymetrix was simply "developing new gene chip products" as expressly

---

[3] The Agreement refers to "Affymetrix," "Enzo," and "Product(s)" in all capital letters, which the Court modifies so that only the first letter of these terms is capitalized.

6

permitted under Section 5. (Reply at 8–9.) Affymetrix's first argument directly contradicts the broad use restrictions in the Distribution Agreement. Regardless of when in the development process Affymetrix used Enzo's Products, there is evidence that Affymetrix used Enzo's Products to bring RLR and DLR to market, so the Court cannot hold as a matter of law that Affymetrix did not "use" Enzo's Products. As for whether Defendant's use constituted permissible development of "new gene chip products" pursuant to Section 1 and Section 5, the Court finds the Agreement to be ambiguous. Significantly, the Agreement does not define "gene chip products," and on its face, the term could reasonably be construed to mean either (1) only those products that are themselves gene chips – *i.e.*, not labeling reagents – or, alternatively, (2) any product that incorporates gene chips. Because the term reasonably suggests either meaning, and because Enzo has adduced evidence that would support a finding that RLR and DLR are not "gene chip products," let alone "new" ones (*see* Grassotti Decl. Ex. 4 at 31:25–33:20, 68:12–22, 70:22–71:12, 108:13–18), the Court cannot determine as a matter of law that Affymetrix's use of Enzo's Products in order to develop RLR and DLR fell within the permissible uses set forth in Section 1 and Section 5. *Am. Home Assur. Co.*, 639 F.3d at 567. Accordingly, the Court denies summary judgment on Enzo's claim for breach of the Agreement's use restrictions.

C. The Grant-Back Provision

Enzo also alleges that Affymetrix breached the grant-back provision of the Distribution Agreement by failing to give Enzo the rights to the RLR and DLR labeling reagents after Affymetrix developed them. (*See* Compl. ¶¶ 63–78; Opp. at 1, 14–16.) Affymetrix began developing labeling reagents that culminated in RLR and DLR long before Enzo and Affymetrix entered into the Distribution Agreement. (Grassotti Decl. Ex. 4 at 30:9–31:16.) However, Affymetrix continued developing these Products throughout the term of the Agreement (*id.*), so

Enzo contends that this continued development brings the reagents within the ambit of the grant-back provision, which states:

> If any invention or product is conceived during the course of Affymetrix's use of the Products . . . and is directed to the Products, or their use, or improvements thereto, . . . Enzo will retain [certain] rights to such inventions and products including but not limited to those for labeling and detection processes and components therefor.

(DA § 5.) Thus, the central questions raised by Enzo's claim under the grant-back provision are (1) whether Affymetrix's RLR and DLR labeling reagents were "conceived during the course of" Affymetrix's use of Enzo's Products, and (2) whether they were "directed to" such Products or to "their use" or to "improvements thereto." (*Id.*)

With respect to the first question, it is not clear that Affymetrix "conceived" of its competing products "during the course of" its use of Enzo's Products. Among other definitions, to "conceive" can mean to "cause to begin," to "originate," or to "start," but it may also denote the process of "giv[ing] forth" or "produc[ing]." *Webster's Third New Int'l Dictionary* 469 (Philip Babcock Gove ed., 2002). These varying definitions illustrate at least two ways that "conceived" could be interpreted in the context of the grant-back provision. On the one hand, the term could be deemed to apply only to an invention or product that was originated or started while Affymetrix used Enzo's Products – which is not the case here since the undisputed evidence shows that Affymetrix originated its reagent development *before* the parties ever entered into the Distribution Agreement. (Enzo 56.1 Stmt. ¶¶ 2–6; Grassotti Decl. Ex. 4 at 30:9–31:16 (describing Affymetrix's reagent development history).) Alternatively, as Enzo suggests, the provision could be read more broadly, giving Enzo rights to any invention or product that is developed, produced, or brought to fruition during Affymetrix's use of the Products. (Opp. at 15 (reasoning that Enzo was entitled to RLR and DLR because "Affymetrix used Enzo Products *to*

*develop* [these] new labeling reagents" (emphasis added)).) Given this ambiguity, the Court is not in a position to grant summary judgment on this basis.

However, with respect to the second question – whether RLR and DLR were "directed to" Enzo's Products or to "their use" or to "improvements thereto" – the language of the Distribution Agreement cuts against Enzo's claim. Enzo argues that RLR and DLR "almost by definition were inventions or products directed to the Products and their use, if not necessarily improvements thereon." (Opp. at 15.) The Court concludes, however, that the unambiguous terms of the contract refer to inventions or products that act upon or interact with or augment the Products; that feature in the use of the Products; or that render improvements to the Products. These specifications do not encompass Affymetrix's development of RLR and DLR. RLR and DLR were replacements or alternatives for – not improvements *to* – Enzo's Products (Enzo 56.1 Stmt. ¶ 3), and the only evidence in the record with respect to Affymetrix's use of Enzo's Products in developing RLR and DLR shows that these reagents were tested against Enzo's Products to compare their effectiveness (Grassotti Decl. Ex. 4 at 25:2–26:8, 49:1–20, 96:10–97:4, 108:9–18 (discussing Enzo's and Affymetrix's labeling reagents and efforts to compare their efficacy); *id.* Ex. 22 at 18 (describing comparability of RLR and the "current labeling system"); *id.* Ex. 35 (comparing the performance of Enzo Products with other products when utilized in Affymetrix's GeneChip Assays); *id.* Ex. 39 (touting "comparable data" yields from Affymetrix labeling kits as from Enzo kits); *id.* Ex. 43 (comparing the performance of Enzo Products with Affymetrix products).) The fact that Affymetrix compared the results achieved by RLR and DLR with the results achieved by the Products does not mean that the former was directed to the latter, nor can the Court see how such a comparison could be deemed to be directed to the use of the Products or to improvement to the Products. Because RLR and DLR

9

were not in any way "directed to" the Products, and because Enzo has adduced no evidence to support the inference that Affymetrix "conceived" its products while it used Enzo's, the Court grants summary judgment in Affymetrix's favor on this claim.

### D. The Shortfall Provision

Enzo also claims that Affymetrix breached the Distribution Agreement by failing to account for a shortfall in its sales of Enzo Products in 2003. (*See* Compl. ¶¶ 45–49; Opp. at 1, 20.) Section 6 of the Agreement required that

> [a]t the end of each calendar year, Affymetrix additionally pay Enzo an amount equal to 0.50 of Enzo's catalog price for Products sold [under the Agreement] to account for the distribution, sales and services provided by use of the GeneChip® arrays or array sets in those instances where Products were purchased from Enzo in quantities less than would be used in conjunction with the GeneChip® arrays or array sets associated with a Product during such calendar year. If the discrepancy between the GeneChip® arrays or array sets sold and used and Product provided by Enzo to Affymetrix is greater than ten percent (10%), then Affymetrix will additionally pay Enzo an amount equal to 0.60 of Enzo's catalog price for such Products. Affymetrix can adjust this annual payment if it can provide reliable written documentation to Enzo that the Products or any other labeling reagent selected by an Affymetrix customer for use with the GeneChip® assays or array sets were sold directly by Enzo or authorized by Enzo distributors.

(DA § 6.) From this stultifying language, the Court gathers that Affymetrix had to pay Enzo for any shortfall in sales of Enzo's Products but that Affymetrix could justify shortfalls and thereby adjust its penalty payments to Enzo. However, among its other shortcomings, this provision omits a critical piece of information that renders it ambiguous. How is a shortfall to be identified and measured? The Agreement refers only to "quantities less than would be used in conjunction with the GeneChip® arrays or array sets," but it offers no method for determining the quantity that "would be used." (*Id.*) In short, there is no explanation of the appropriate ratio between Products and GeneChip® arrays or array sets.[4]

---

[4] Enzo contends in its brief that Exhibit 41 of the Grassotti Declaration provides evidence of a specific ratio of Enzo Products to GeneChip® arrays or array sets (*see* Opp. at 20), but neither that exhibit nor any of the exhibits in close

10

Nor has Enzo adduced any evidence to suggest that there was *any* shortfall in 2003 sales. Significantly, Enzo's Local Rule 56.1 Statement makes no mention of sales amounts from 2003, and to the extent that Enzo addresses shortfalls in its opposition brief, it does not point to evidence in the record from which the fact finder could reasonably infer that Affymetrix failed to sell the appropriate number of Enzo Products in 2003. Enzo argues that "Affymetrix was required to purchase 19,179 Enzo Products" yet "only purchased between 3,600 and 5[,]000," but Enzo cites only one document to support this contention. (Opp. at 20.) That document – a spreadsheet that is untitled, unattributed, and unexplained in Enzo's declarations – contains an entry for 19,179 "2003 Enzo kit sales (kit units)," but it does not suggest who calculated those sales amounts or whether such sales actually occurred or simply should have occurred, nor does the document make any reference to the other figures that Enzo touts in its brief. (Grassotti Decl. Ex. 42.) Seeing no evidence to support an inference that "Products were purchased from Enzo in quantities less than would be used in conjunction with the GeneChip® arrays or array sets associated with a Product," the Court grants summary judgment on this claim in favor of Affymetrix.[5]

E. Implied Covenant of Good Faith and Fair Dealing

Finally, Enzo contends that "Affymetrix breached the implied covenant of good faith and fair dealing by providing Enzo artificially high sales forecasts during 2002 for the purpose of building up a stockpile of inventory of the Products." (Opp. at 21; *see* Compl. ¶¶ 79–82.) Enzo

---

proximity to it discusses sales ratios or shortfalls.

[5] To be clear, the Court acknowledges that the parties have not yet engaged in damages discovery, so, at this stage, Enzo would not be expected to determine with precision the damages it might have suffered from a shortfall. Nevertheless, on a motion for summary judgment as to liability, Enzo must produce some evidence that supports its claim, and as the Court explains above, Enzo has not done so. *See Celotex Corp.*, 477 U.S. at 322 ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

11

also asserts that the Distribution Agreement was a "requirements contract" (Opp. at 21) and that "'courts have held uniformly that a buyer may not in good faith demand disproportionately *more* than the buyer's anticipated requirements, as measured by a stated estimate or normal or otherwise comparable prior requirements.'" (*Id.* (quoting *MDC Corp., Inc. v. John H. Harland Co.*, 228 F. Supp. 2d. 387, 395 (S.D.N.Y. 2002) (applying N.Y. U.C.C. § 2-306(1))).) On this record, there is evidence to support a finding that Affymetrix breached its good faith obligations to Enzo.

An implied covenant of good faith and fair dealing is incorporated into every contract, and it "'precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement.'" *Oscar de la Renta, LTD. v. Mulberry Thai Silks, Inc.*, No. 08 Civ. 4341 (RJS), 2009 WL 1054830, at *5 (S.D.N.Y. Apr. 17, 2009) (quoting *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1560 (2d Cir. 1989)). To breach that duty is to breach the contract. *Boart Longyear Ltd. v. Alliance Indus. Inc.*, 869 F. Supp. 2d 407, 413 (S.D.N.Y. 2012). New York law clarifies a particular duty of good faith in the context of a requirements contract:

> A [contract] term which measures the quantity by . . . the requirements of the buyer means such actual . . . requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior . . . requirements may be tendered or demanded.

N.Y. U.C.C. § 2-306(1). Here, Affymetrix was obligated under the Distribution Agreement to purchase its Product requirements from Enzo. (DA § 1 (agreeing "not to purchase any Products from other suppliers or manufacturers" and to "rely on Enzo as its sole source of Products").) Although Affymetrix had entered into a requirements contract, there is evidence that, in 2002, Affymetrix purchased far more Products from Enzo than it sold to third parties. (*Compare* Grassotti Decl. Ex. 15 (showing approximately 42,000 Product purchases), *with* Ex. 31 (showing

12

sales of approximately 17,000 Products).) There is also evidence that Affymetrix sought to build up a stockpile (*id.* Ex. 28 (making inquiries about the purchase requirements for building a six- to twelve-month inventory of Products) and that it sought to hide that buildup from Enzo (*id.* Ex. 29 (describing a "large volume ramp up" of Product purchases executed in a manner intended "not to alert Enzo to[o] much"); Enzo 56.1 Stmt. ¶ 8). Finally, there is evidence that Affymetrix was completing development of its reagents that would replace Products provided by Enzo (*see id.* ¶¶ 3–6; Grassotti Decl. Ex. 22 (November 2002 presentation comparing Products with Affymetrix's reagents with the express purpose of providing an alternative labeling method)), and that Affymetrix sought to provide a "[s]mooth [t]ransition" over a six-month period for its customers that were switching over to Affymetrix's reagents (Grassotti Decl. Ex. 24 (review of plans for launching Affymetrix's proprietary labeling reagent) at 11; *see also* Enzo 56.1 Stmt ¶ 10 (noting that Affymetrix did not plan to order any more kits from Enzo after January 2003)). The reagents were ultimately launched in late 2003 and 2004. (Enzo 56.1 Stmt ¶ 12.) Taken together, this evidence could support a finding that Affymetrix breached the covenant of good faith and fair dealing by tacitly stockpiling Products in order to seamlessly launch Affymetrix's own reagents, which would obviate Affymetrix's need for Enzo. *See* N.Y. U.C.C. § 2-306(1); *Leberman*, 880 F.2d at 1560; *see also Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007) ("[W]hether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts . . . and is ordinarily a question of fact to be determined by the jury . . . ."). Accordingly, the Court denies summary judgment on this claim.

13

III. CONCLUSION

For the reasons stated above, Affymetrix's motion for summary judgment is granted in part, but it is denied with respect to Enzo's claim for violations of the use restrictions set forth in Section 1 and Section 5 of the Distribution Agreement and its claim for breach of the implied covenant of good faith and fair dealing. The Clerk of the Court is respectfully directed to terminate the motion pending at Doc. No. 98.

With respect to Enzo's surviving claim, IT IS HEREBY ORDERED THAT this case shall proceed to trial on April 14, 2014 at 9:30 a.m. in Courtroom 905 of the Thurgood Marshall United States Courthouse. IT IS FURTHER ORDERED THAT, by December 20, 2013, the parties shall submit a joint letter proposing a pretrial schedule and apprising the Court of the status of the related case, *Affymetrix, Inc. v. Enzo Biochem, Inc*, No. 03 Civ. 8907 (RJS).

SO ORDERED.

DATED:   December 6, 2013
         New York, New York

RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE

\*   \*   \*

Enzo is represented by Michael Burrows, Scott J. Bornstein, Jeffrey R. Mann, Ronald D. Lefton, Richard C. Pettus, and Lauren B. Grassotti of Greenberg Traurig, LLP, 200 Park Avenue, New York, New York 10166, and Victor H. Polk, Jr. of Greenberg Traurig, LLP, One International Place, Boston, Massachusetts 02110.

Affymetrix is represented by Peter E. Root and Michael J. Malecek of Kaye Scholer LLP, Two Palo Alto Square, 3000 El Camino Real, Suite 400, Palo Alto, California 94306.